## Bross v. Home Supermarket Grocery Co.

*Gordon Cavanaugh,* for plaintiffs.
*Murry Powlen,* for defendant.

STOUT, J., December 18, 1962.—Uldis N. Bross and Brigita, his wife, are 32 and 30 years old, respectively. They speak English with some little difficulty and in the decided brogue of their native Latvia. Mr. Bross holds a B. S. degree in economics from the Wharton School of the University of Pennsylvania where he majored in insurance. He is a life underwriter by profession. Mrs. Bross is a housewife and a graduate of a high school in Germany. She has been in America 11 years.

Plaintiff Uldis Bross testified that defendant's agent, Fred Owens, called at their home on the evening of June 8, 1961, and stated he was there to discuss a food plan and how to save money on food. He proposed that plaintiffs would buy food from the Home Supermarket Company who would supply a freezer for their use and that if plaintiffs continued to purchase food from defendant for a certain period of time, the freezer would be theirs. Mr. Bross testified that, in response to questioning as to whether they would be obligated to purchase a freezer, defendant's agent reiterated that he was only there to sell food, not a freezer, but that the freezer would be theirs at the end

of three years if they continued their food purchase. He continued to stress tremendous savings throughout the conversation.

Defendant's agent then presented the so-called contract for signature which he said was an agreement to purchase food for 36 months at a minimum of $15 a week. The other figures appearing on the paper, he said, represented plaintiffs' great savings. Defendant's agent had Mr. Bross complete a financial statement and also sign the Program Chart for Additional Savings which, he said, was for him to show his office that he had explained to plaintiffs about their big savings. Finally, defendant's agent presented a printed form in blank for plaintiffs' signature which he said was for financing of food which was to be delivered in batches of one, two or three months' supply. This was the note, later completed in long hand, for purchase of the freezer. After gathering all the papers on which he had obtained plaintiffs' signatures, defendant presented them with a carving set, apparently symbolic of the operation he so skillfully had performed.

The freezer was delivered the following afternoon and plaintiffs were informed that a home economist would call to take the food order.

On June 13, the "home economist," John Paul Demetris, came and took an order for food. He had Mrs. Bross sign the Customer's Contract Verification on that occasion. When the food arrived, the bill was $118 instead of the $66 worth Mrs. Bross had ordered. She telephoned the company, and spoke with a Mr. Phillips, who identified himself as the manager. He told her not to worry about the additional food, that the first order was usually a little more because they wanted to make sure they had plenty of everything; that "that makes things less confusing."

Mr. Bross testified that to his surprise, a payment book came from The First Pennsylvania Company the last of June or the first of July and that only then did he realize the nature of the transaction. He complained to the bank and then to the Home Supermarket Grocery Company. He spoke by telephone with a Mr. Ludwig of the Home Supermarket Grocery Company and, on July 23, 1961, wrote a letter of complaint. He had additional conversations with Mr. Ludwig in which he advised him he wanted to return the freezer and call the deal off. To this Mr. Ludwig at first replied: "Let us get all the facts first, and see what is what." After later conversations he finally said: "Sorry we can't do anything more. That is all I can say."

Plaintiffs received only one order of food. They have continued to make payments to The First Pennsylvania Company on the advice of counsel.

Plaintiff Brigita Bross was called by defendant as of cross-examination. She admitted that she signed the Customer's Contract Verification upon the request of Mr. Demetris but denied that she read it or knew it was of any importance. She testified, however, that the words in bold face at the end, "No additional charge," represented exactly what Mr. Owens had told them initially; that, if they would buy food for 36 months, they would get the freezer at no additional charge, and that, if they stopped buying food, the only consequence would be loss of the freezer.

Defendant's only other witness was the so-called home economist, John Paul Demetris, who called himself a food consultant but whose training is that of a meat cutter. Neither Mr. Owens, the agent who secured the so-called contract, nor Mr. Ludwig, the purported manager, appeared. Mr. Demetris testified he went to the Bross home on June 13, took the order, filled in the Customer's Contract Verification, which was in keep-

ing with "company policy," reviewed the payments with Mrs. Bross and had her sign the "verification."

Although the only one of the four documents having legal efficacy, the negotiable promissory note, was fair and regular on its face, the other three documents were fraudulent, deceptive and misleading. Obviously, the so-called "contract" and the Program Chart for Additional savings on the one hand and the Customer's Contract Verification on the other, between which the one valid document, the promissory note, was neatly sandwiched, were conceived in fraud and drafted with premeditated ingenuity. The first two were designed as a sedative to lull the prospective notemaker into an unawareness of the nature of the impending operation and into the delusion that he was entering into a great money-saving proposition. The "verification" was designed to prevent outcry from the shock which defendant knew plaintiffs would experience upon receipt of a book to be used in connection with payments on an appliance which plaintiffs never agreed to purchase.

Based on the so-called contract and accompanying documents alone, to deny rescission of the transaction "would be but to lend the aid of the court to the artifice and trick of men who desired to sell their wares, not by honest dealing, but by intentional deceit": American Travel & Hotel Directory Co. v. The Roycrafters, 125 Misc. Rep. 853, 213 N. Y. S. 42 (1925). See also, American Travel & Hotel Directory Co. v. Curtis, 236 Ill. App. 236 (1925); Ashland Towson Corp. v. Kasunic, 110 Pa. Superior Ct. 496, 168 Atl. 502 (1933); International Transportation Assn. v. Bylenga, 254 Mich. 236, 236 N. W. 771 (1931).

The fact that the so-called contract was not only accompanied by other deceptive documents but that the signatures thereto were secured by equally false, fraudulent, misleading and deceptive representations on the part of defendant's agent dictates rescission even more

strongly. To paraphrase and quote Sutton v. Morgan, 158 Pa. 204, 27 Atl. 894 (1893) : Prudence should have led plaintiffs to examine more carefully the documents which they signed and to test more carefully the truth of the glowing statements made by defendant's agent, but they did not. "They fell easily into the trap which was set, with some skill and some effrontery, for them; but their neglect, or want of prudence, cannot justify the falsehood or fraud of those who practiced upon their credulity. The doctrine of contributory negligence cannot be invoked by the defendants to save them from liability for misleading their victim. They must stand or fall on the truth, and good faith, of the represen- tations that led to the sale": 158 Pa. at 218-219. See also, Suraci v. Ball, 160 Pa. Superior Ct. 349, 51 A. 2d 404 (1947) ; Western Manufacturing Co. v. Cotton & Long, 126 Ky. 749, 104 S. W. 758; and Schupp v. Davey Tree Expert Co., 235 Mich. 268, 209 N. W. 85 (1926).

Defendant is not aided by the recitation in the so- called contract that it "will not be responsible for any representation, promise or inducement, of an agent or employee of either Dealer or Home Supermarket Grocery Company." Such merger or integration clauses have never precluded proof that the contract was tainted with fraud: La Course v. Kiesel, 366 Pa. 385 (1951) ; Cf. Fidelity Trust Co. v. Gardiner, 191 Pa. Superior Ct. 17, 155 A. 2d 405 (1959) ; 3 Williston Contracts, 3rd ed., §811; Restatement of Contracts, §§470, 471, 476.

Neither can defendant who was guilty of deliberate fraud in both the preparation of the so-called contract and other documents and in the representations which resulted in the signatures thereto absolve itself because of plaintiffs' education and experience. See Schupp v. Davey Tree Expert Co., supra, where victim was a man of business acumen and experience; Ashland Towson Corp. v. Kasunic, supra, where victim was an

assistant bank cashier; International Transportation Assn. v. Bylenga, supra, where victim was manager of a transportation company; American Travel & Hotel Directory Co. v. Curtis, supra, where victim was a manufacturer; American Travel & Hotel Directory Co. v. The Roycrafters, supra, where victim was a hotel man. As a matter of policy, it is better to encourage carelessness, negligence, credulity, foolishness, guilelessness or even stupidity in the victim than to encourage fraud in the deceitful. See Ashland Towson Corp. v. Kasunic, supra, and other cases cited above.

### Decree Nisi

Upon consideration of the foregoing case, it is ordered, adjudged and decreed that:

1. Defendant pay plaintiffs $1,077.70.

2. Plaintiffs return the "Marquette" refrigerator-freezer to defendant.

3. Plaintiffs pay to The First Pennsylvania Banking and Trust Company the balance due on the promissory note fraudulently induced by defendant.